UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| LIFESPAN CORPORATION,<br>    Plaintiff,<br><br>    v.<br><br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA. and<br>RLI INSURANCE COMPANY,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 12-300-M |

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

Lifespan filed this lawsuit to obtain a declaratory judgment and monetary damages from the two defendant insurance companies, National Union Fire Insurance Company of Pittsburgh, Pennsylvania and RLI Insurance Company. Lifespan seeks coverage under its policies with National Union and RLI in connection with a $29,605,282.93 amended judgment issued against it at the conclusion of litigation between Lifespan, New England Medical Center, Inc. ("NEMC"), and the Massachusetts Attorney General (the "Attorney General") regarding a five-year affiliation between Lifespan and NEMC (the "Underlying Suit"). The question is whether Lifespan, through its insurance policies, has coverage for its monetary losses stemming from breaches of fiduciary duties and gross negligence in connection with the negotiation of NEMC's health insurer contracts and an interest rate swap transaction.

Three motions for summary judgment bring the matter before this Court. (ECF Nos. 20, 22, 24). They raise the issue of whether the defendant insurance companies have proven that various exclusions to established insurance coverage apply. After a thorough review of the facts

and the law, and after extensive briefing and lengthy arguments, this Court finds that the exclusions to coverage asserted by the insurance companies do not apply.

## I. BACKGROUND[1]

### A. Before The Underlying Suit

In January of 1997, Lifespan and NEMC executed a memorandum of understanding "proposing an affiliation in which Lifespan would become NEMC's corporate parent, and NEMC would in turn become one of the hospital subsidiaries in Lifespan's system." *Findings of Fact* at ¶ 5. NEMC, a non-profit hospital in Boston, was one of the smallest teaching hospitals in the area and it "had been in a downward spiral, losing money, patient volume, and its ability to participate in one of the area's major insurance networks." *Id.* at ¶¶ 2, 4. Lifespan, "an umbrella organization that provides managerial, administrative, and other support services to its hospital subsidiaries," "saw the proposed affiliation as an opportunity to expand its healthcare system beyond Rhode Island into Massachusetts." *Id.* at ¶¶ 1, 6.

After conducting due diligence and obtaining regulatory approvals, "Lifespan and NEMC entered into a final Amended and Restated Master Affiliation Agreement [the "Affiliation Agreement"] in October 1997." *Id.* at ¶ 8. Per the Affiliation Agreement, Lifespan established Lifespan of Massachusetts, Inc. ("LOM") and maintained majority control of LOM. *Id.* at ¶ 9. "LOM, in turn, became the sole voting member of NEMC, with the power to oversee and control its operations, including major financial decisions, budgeting, strategic planning, policymaking,

---

[1] This Court relies heavily on the May 24, 2011 "Findings of Fact & Rulings of Law After Bench Trial" issued in the Underlying Suit because it contains a great deal of the material necessary for this Court to rule on the pending motions. *See Lifespan Corp. v. New England Med. Ctr., Inc. & Martha Coakley, Attorney General for the Commonwealth of Mass.*, No. 2006-cv-421, 2011 WL 2134286 (D.R.I. May 24, 2011) ("*Findings of Fact*"). The eighty-three page *Findings of Fact* is docketed in this case at ECF No. 21-2.

and contractual negotiations with health insurers." *Id.* Through its majority control of LOM, Lifespan had "the ability to control NEMC." *Id.* "In exchange for NEMC's agreement to join Lifespan's system and submit to its control, Lifespan agreed to transfer $8.7 million per year to NEMC, which resulted in a total transfer of about $42 million over the course of the affiliation." *Id.* at ¶ 10. NEMC paid its "share of Lifespan's corporate overhead expenses, which totaled about $172 million over the course of the affiliation." *Id.*

"During the first three years of the affiliation, NEMC's financial situation improved somewhat, largely because of its return to the Harvard Pilgrim network," but it "continued to lose money." *Id.* at ¶ 13. "During the last two years of the affiliation, NEMC's financial situation deteriorated further." *Id.* at ¶ 14. "NEMC became increasingly upset with Lifespan over the performance of its health insurer contracts, the unfavorable outcome of a complex financial transaction, known as an interest rate swap, recommended by Lifespan's CFO, and the amount of Lifespan's corporate overhead charges." *Id.* (internal citations omitted).

"Recognizing that the affiliation was not working, NEMC proposed, and Lifespan agreed, to disaffiliate through a Restructuring Agreement signed in September 2002 and then closed in November 2002." *Id.* at ¶ 15. Under the Restructuring Agreement, NEMC was required "to make a series of payments to Lifespan totaling $30 million and also to split on a 50/50 basis . . . any recovery received from Medicare by NEMC . . . for the loss on sale/depreciation recapture resulting from the Affiliation." *Id.* (internal quotation marks omitted). While NEMC paid most of the $30 million to Lifespan required by the Restructuring Agreement, it refused to pay the final two installments totaling $3.66 million because "NEMC claimed that it had sustained losses far in excess of that amount because of Lifespan's misconduct during the affiliation, including

with regard to (1) the health insurer contracts, (2) the interest rate swap, (3) the corporate overhead charges, and (4) NEMC's overall financial performance." *Id.* at ¶ 16.

In addition, "[t]he Restructuring Agreement provides that 'Lifespan will indemnify NEMC for any losses it incurs that result directly and solely . . . from Lifespan's willful misconduct or gross negligence in the provision of services to NEMC by Lifespan employees working under the supervision and direction of Lifespan employees during the Affiliation Period.'" *Id.* at ¶ 39. The Restructuring Agreement also contains releases of liability, including a release providing that NEMC "hereby releases, remises and forever discharges any and all rights and claims that [it] has had, now has, might now have or might in the future have against Lifespan . . . or their officers, directors, employees and agents arising from or in connection with the [Affiliation Agreement]." (ECF No. 21-9 at 29-30).

### B.    The Underlying Suit

In 2006, Lifespan filed the Underlying Suit in this district, "alleging breach of contract and seeking to recover the $3.66 million that NEMC refused to pay." *Findings of Fact* at ¶ 17. "NEMC brought a counterclaim against Lifespan under the Restructuring Agreement's indemnification provision, seeking to recover the losses allegedly caused by Lifespan's misconduct" as well as "counterclaims for breach of fiduciary duty, unjust enrichment, and unfair business practices." *Id.* (internal citation omitted). Lifespan later amended its complaint to add a contract claim for half of the Medicare reimbursement NEMC received. *Id.* at ¶ 19. Then NEMC added "more counterclaims, asserting that the Restructuring Agreement's Medicare recovery provision was inapplicable, unconscionable, contrary to public policy, lacking in consideration, a violation of the Affiliation Agreement, a breach of fiduciary duty, and an unjust enrichment." *Id.*

Following recusal by all of the judges in this district at that time, the case was assigned to Judge Joseph N. Laplante of the United States District Court for the District of New Hampshire. *Id.* at ¶ 20.[2] Then the court "granted a motion by the Massachusetts Attorney General to intervene in the case on behalf of the public interest pursuant to her supervisory authority over NEMC as a public charity." *Id.* at ¶ 21 (internal citation omitted). "[T]he Attorney General joined in nearly all of NEMC's counterclaims against Lifespan (except for the indemnification and unfair business practices claims)" and "did not assert any new claims of her own." *Id.*

All three parties moved for partial summary judgment. *Id.* at ¶ 22. "NEMC and the Attorney General moved for summary judgment on the issue of whether Lifespan owed a fiduciary duty to NEMC during the affiliation." *Id.* Applying Massachusetts law, the court concluded that "Lifespan did owe a fiduciary duty to NEMC, by virtue of its control over a non-profit hospital and the faith, confidence, and trust that NEMC placed in its judgment and advice." *Id.* (internal quotation marks and citation omitted). Lifespan sought "summary judgment on its claim for half of NEMC's recent Medicare recovery, and on nearly all of the counterclaims (except for NEMC's indemnification claim, which the parties agreed was trialworthy)." *Id.* at ¶ 23.

The "court ruled that Lifespan was entitled to half of the Medicare recovery,[3] rejecting the slew of counterclaims challenging the Restructuring Agreement's Medicare recovery provision." *Id.* (citation omitted). The court also "ruled that NEMC had released its tort counterclaims against Lifespan through the Restructuring Agreement, including its claims for breach of fiduciary duty and unfair business practices, leaving itself only a contractual remedy

---

[2] The case always remained on the District of Rhode Island docket. *Id.*
[3] The court did not enter judgment for Lifespan at this time because "NEMC's 'closely related' indemnification claim was still unresolved." *Id.* (citation omitted).

under the agreement's indemnification provision." *Id.* at ¶ 24 (citations omitted). NEMC's unjust enrichment counterclaim also was rejected, as it was "unavailable in light of NEMC's contractual remedy." *Id.* (citations omitted). However, the court found "that the Attorney General was not bound by NEMC's release and could therefore proceed to trial on her claim for breach of fiduciary duty." *Id.* at ¶ 25 (citation omitted).

The court held a three-week bench trial in New Hampshire in February and March of 2011, hearing from almost twenty witnesses. *Id.* at ¶ 26-27. "Because only the Attorney General's breach of fiduciary duty claim and NEMC's indemnification claim were still in genuine dispute," the "court treated the Attorney General and NEMC as plaintiffs during the trial, and Lifespan as the defendant." *Id.* at ¶ 26.

After the trial, the court reviewed various submissions from the parties and then issued its *Findings of Fact.* (ECF No. 21-2 at 3). In short, the court found that (i) NEMC breached the Restructuring Agreement by failing to make two payments and by failing to pay Lifespan half of the Medicare recovery, *Findings of Fact* at ¶¶ 52-54; (ii) Lifespan breached its fiduciary duty of care to the Attorney General, *see, e.g., id.* at ¶¶ 93-94, 96, 99-102, 136-44; and (iii) "Lifespan's gross negligence directly and solely caused NEMC to incur [] losses," *id.* at ¶ 107, so Lifespan was responsible for indemnifying those losses in accordance with the Restructuring Agreement. *Id.* at ¶¶ 103, 145, 155. Lifespan's liability to the Attorney General was by virtue of its breach of fiduciary duty, *id.* at ¶¶ 29-35, while its liability to NEMC arose from the indemnification clause of the Restructuring Agreement. *Id.* at ¶¶ 39.

As noted *supra*, in their case against Lifespan, NEMC and the Attorney General focused on "Lifespan's misconduct during the affiliation, including with regard to [four distinct issues:] (1) the health insurer contracts, (2) the interest rate swap, (3) the corporate overhead charges, and

(4) NEMC's overall financial performance." *Id.* at ¶ 16. The court found against Lifespan regarding the first two issues: health insurer contracts, *id.* at ¶¶ 56-107, and the interest rate swap. *Id.* at ¶¶ 108-55. Regarding the latter two issues, corporate overhead charges, *id.* at ¶¶ 156-78, and NEMC's overall financial performance, *id.* at ¶¶ 179-99, the court found that Lifespan did not have any liability. *Id.* at ¶¶ 161-78, 192-99. Therefore, this Court's insurance coverage analysis involves only the health insurer contracts and the interest rate swap.

A.    **The Health Insurer Contracts**

NEMC and the Attorney General alleged that Lifespan failed "to meet the standard of care in negotiating NEMC's contracts with health insurance providers (also called 'payors') during the affiliation." *Findings of Fact* at III.B. Under the Affiliation Agreement, "Lifespan had authority . . . to negotiate NEMC's payor contracts, which it delegated to the Lifespan Physicians Professional Services Organization ('PSO'), a joint venture between Lifespan and certain Rhode Island-based physician groups." *Id.* at ¶ 56. "Lifespan had control over the PSO and, through it, control over NEMC's payor contracting throughout the affiliation." *Id.*

The court agreed with the Attorney General "that Lifespan breached its fiduciary duty of care to NEMC by failing to renegotiate NEMC's Cigna and United[4] contracts to obtain inflationary increases in their reimbursement rates by the end of the affiliation's second year and annually thereafter." *Id.* at ¶ 93 (citation omitted). The court explained, "[t]hose failures constituted 'clear and gross' departures from the standard of care that any reasonable party in Lifespan's position would have exercised." *Id.* at ¶ 93. The court also agreed "with the Attorney General that Lifespan breached its fiduciary duty of care to NEMC by failing to negotiate jointly with Cigna on behalf of NEMC and the Rhode Island hospitals, and failing to share Cigna's

---

[4] Cigna and United are a "for-profit payors with a national presence." *Id.* at ¶ 61.

Rhode Island rate information with NEMC and the PSO's Massachusetts team." *Id.* at ¶ 94 (citations omitted). The court explicated, "[t]hose, too, were 'clear and gross' departures from the standard of care that any reasonable party in Lifespan's position would have exercised." *Id.* at ¶ 94 (citations omitted). The court concluded that "Lifespan's breaches of fiduciary duty were the 'but-for' and proximate cause of damages to NEMC." *Id.* at ¶ 98 (internal citation omitted). Those breaches "foreseeably prevented NEMC from obtaining higher reimbursement rates from Cigna and United, and thereby resulted in NEMC's receiving significantly less revenue from those payors during the affiliation." *Id.*

Focusing on NEMC's indemnification claim, the court explained that "[t]he individuals responsible for overseeing NEMC's payor contracting during the affiliation . . . were Lifespan employees working under the supervision and direction of Lifespan employees, and were providing services to NEMC." *Id.* at ¶ 104 (citation omitted). The court concluded that "Lifespan was grossly negligent" in three respects: (i) "in failing to renegotiate the Cigna and United contracts to obtain inflationary increases in their reimbursement rates," (ii) "in failing to jointly negotiate with Cigna on behalf of NEMC and the Rhode Island hospitals or to share Cigna's Rhode Island rate information across the system," and (iii) "in failing to obtain sufficient rates and margins from Cigna." *Id.* at ¶ 105 (citation omitted).

## B. The Interest Rate Swap

NEMC and the Attorney General alleged that Lifespan was liable for "misconduct in connection with a complex financial transaction, known as an interest rate swap, that NEMC executed during the last year of the affiliation." *Findings of Fact* at III.C. Specifically, more than $100 million in revenue bonds issued by NEMC were callable in July 2002. *Id.* at ¶ 108. Leading up to July 2002, "interest rates dropped significantly from the rate at which the bonds

had been issued, creating a potential opportunity for NEMC to refinance the bonds at a lower rate." *Id.* The court detailed the complex business relations between NEMC, Lifespan, and Morgan Stanley related to the interest rate swap. *Id.* at ¶¶ 109-34.

Approximately a year before the bond call date, Lifespan's CFO, David Lantto, arranged for financial services firm Morgan Stanley to "present a bond refinancing proposal to NEMC." *Id.* at ¶ 109. "Morgan Stanley proposed that NEMC refinance the bonds in July 2002, using Morgan Stanley as underwriter." *Id.* Morgan Stanley also "proposed that NEMC enter into an interest rate swap." *Id.* "The idea for the swap came from Morgan Stanley broker Jeff Seubel, who suggested it to [Mr.] Lantto, who in turn suggested it to NEMC." *Id.* at ¶ 113.

"Unbeknownst to NEMC, [Mr.] Lantto had a close, longstanding personal friendship with [Mr.] Seubel." *Id.* at ¶ 114. They had worked with each other in the past, and Mr. "Seubel had recommended [Mr.] Lantto for the CFO position that [Mr.] Lantto held before coming to Lifespan." *Id.* In addition to their business relationship, their "mutual affinity for wine" developed into a personal relationship with wine tastings, buying dinner and wine for each other "on numerous occasions, and stay[ing] overnight at each other's homes." *Id.* Mr. "Seubel was also part of a wine-related business partnership that [Mr.] Lantto wanted, but had never been invited, to join." *Id.* Despite Lifespan's clear corporate policy regarding conflict of interest requiring Mr. Lantto to disclose his relationship with Mr. Seubel, Mr. Lantto "failed to disclose the personal relationship to NEMC, recuse himself, or offer to do so." *Id.* at ¶ 115.

Prior to Mr. Seubel's proposal, NEMC had never entered into, or seriously considered an interest rate swap. *Id.* at ¶ 113. Morgan Stanley claimed that the interest rate swap would "enable NEMC to 'lock in' the current low interest rate and 'protect' against any rate increases before the refinancing date." *Id.* at ¶ 109. The interest rate swap can be summarized as follows:

> NEMC would agree to pay Morgan Stanley a fixed interest rate,
> and Morgan Stanley would agree to pay NEMC a variable interest
> rate (based on a swap rate index), on a notional amount roughly
> equal to the amount of NEMC's bonds. Upon termination of the
> swap, whichever party had the higher balance would pay the
> difference. Thus, if the variable rate went up, Morgan Stanley
> would make a payment to NEMC. Conversely, if the variable rate
> went down, NEMC would make a payment to Morgan Stanley.

*Id.* at ¶ 110. Ordinarily, when the swap rate moves in tandem with the refinancing rate, "the swap would offset any movements in the refinancing rate and effectively enable NEMC to 'lock in' the current rate (minus Morgan Stanley's $1.6 million transaction fee, which was built into the swap)." *Id.* at ¶ 111. However, there are significant risks if the swap rate index "decouples" from the refinancing rate. *Id.* If decoupling occurred, then "NEMC would not actually 'lock in' the current rate; it would be at risk of paying more, or receiving less, in the swap than the amount necessary to offset the changes in the refinancing rate." *Id.* While Morgan Stanley mentioned these risks to NEMC, they were mentioned "only in passing, and not in a way that enabled NEMC to fully understand the nature and scope of the risk."[5] *Id.* at ¶ 112.

Despite the fact that "NEMC's CFO, Mark Scott, strongly opposed the swap, in part because it was a complex transaction and difficult to understand or assess," NEMC engaged in the interest rate swap with Morgan Stanley.[6] *Id.* at ¶¶ 118, 123. The interest rate swap was governed by the "ISDA Master Agreement between Morgan Stanley Capital Services Inc. and New England Medical Center Hospitals, Inc." dated January 15, 2002 (the "Master

---

[5] NEMC brought a claim against Morgan Stanley regarding the swap. *Id.* "They settled the claim in June 2005 for $2.25 million. The settlement agreement stated that Morgan Stanley was not admitting liability and was settling 'solely for reasons of economy.'" *Id.*

[6] "Less than a month later, a group of Lifespan's Rhode Island hospitals rejected a very similar interest rate swap proposed by Morgan Stanley." *Id.* at ¶ 124.

Agreement").[7] (ECF No. 23-10). Soon after the Master Agreement was signed, "interest rates unexpectedly moved in a direction adverse to NEMC's swap position" and, as a result, "NEMC's projected savings on the bond refinancing had dropped by nearly half, to $5.73 million." *Findings of Fact* at ¶ 126.

In August 2002, as NEMC and Lifespan moved closer to disaffiliation, Mr. Lantto distanced himself from the interest rate swap transaction and told NEMC's CFO, Mark Scott, to "take the lead." *Id.* at ¶¶ 118, 129. NEMC then engaged a different consultant, Ponder & Co., and followed its recommendation to refinance the bonds with Merrill Lynch as underwriter. *Id.* at ¶¶ 129, 130. NEMC fired Morgan Stanley. *Id.* at ¶ 130.

The court explained that the losses from the interest rate swap "constituted a breach of [Mr. Lantto's]—and Lifespan's—duty of loyalty to NEMC." *Id.* at ¶ 137. Specifically, the court found that Mr. Lantto:

> knowingly gave Morgan Stanley preferential access to NEMC, concealed from NEMC his personal relationship with [Mr.] Seubel, failed to recuse himself from the proposed swap transaction, pressured NEMC to enter into the swap, prohibited competitive bidding, prohibited NEMC from obtaining a timely second opinion from its chosen consultant, suppressed opposition from NEMC's CFO, advocated the swap to NEMC without discussing its risks, and falsely stated to NEMC that the swap would 'lock in' current interest rates.

*Id.* at ¶ 136.

## C.  The Amended Judgment

Based on its findings of fact and conclusions of law, the court entered an Amended Judgment. (ECF No. 1-20). Including prejudgment interest, Lifespan was awarded $20,398,336.94 for breach of contract, while NEMC and the Attorney General were awarded

---

[7] The Master Agreement specified that it "will be governed by and construed in accordance with the laws of the State of New York." *Id.* at 24.

$29,605,282.93 on their counterclaims for indemnification and breach of fiduciary duty. *Id.* The net award was $9,206,945.99 to NEMC. *Id.* Lifespan satisfied the Amended Judgment by making a net payment of $9,207,778.40 to NEMC.[8] (ECF No. 23-9 at 3). No party took an appeal to the First Circuit Court of Appeals. (*See* ECF No. 1 at 10 ¶ 37; docket in 06-cv-421).

## II.    THIS LAWSUIT

In this case, Lifespan seeks to be indemnified for the amount of the Amended Judgment and post-judgment interest, $29,607,959.57, "in excess of the agreed-upon retention paid by Lifespan for legal services . . . in the amount of . . . $290,064.50." (ECF No. 1 at 13; ECF No. 23-9 at 2). Lifespan has a $15 million policy entitled "Not-For-Profit Individual And Organization Insurance Policy Including Employment Practices Liability Insurance Not-for-Profit Protector[sm]" (the "D&O Policy") from National Union. (ECF No. 1-1 at 3). Lifespan seeks judgment against National Union for the full amount of the Amended Judgment, up to and in excess of the National Union policy limit, including eighty percent of all defense costs it expended in excess of the retention, together with costs, interest, and attorneys' fees. (ECF No. 1 at 14). Lifespan has a $10 million Excess Policy with RLI. *Id.* Lifespan seeks judgment against RLI for the full amount of the Amended Judgment "up to and in excess of the RLI Policy" limit, together with costs, interest, and attorneys' fees. *Id.* at 15.

After describing the insurance policies, this Court turns to the claims in this lawsuit and then focuses on the pending motions.

### A.    Insurance Policies

Lifespan, in accordance with its normal insurance program, "secured a D&O Policy from

---

[8] This amount includes $832.41 in post-judgment interest. This is the difference between the post-judgment interest of $2,676.64 due to NEMC and the Attorney General from Lifespan, and $1,844.23 due to Lifespan from NEMC. (ECF No. 23-9 at 2).

National Union covering losses resulting from wrongful acts, including reimbursement of defense expenses, with an indemnification limit of fifteen million dollars." (ECF No. 22-1 at 5). Lifespan also obtained an Excess Policy from RLI with a limit of ten million dollars excess of the fifteen million dollar National Union policy. *Id.* Both policies were for the same period, October 1, 2005 to October 1, 2006, on a claims basis. *Id.*

The D&O Policy provided coverage for (1) individual insured members of Lifespan, including "a past, present or future duly elected or appointed director, officer, trustee, trustee emeritus, executive director, department head, . . . Employee or volunteer of [Lifespan]"[9]; (2) Lifespan as an organization, "pay[ing] on behalf of the Organization Loss arising from a Claim[10] first made against an Individual Insured . . . only when and to the extent that the Organization has indemnified such Individual Insured for such Loss pursuant to law . . ."; and (3) Lifespan as an organizational entity, "pay[ing] on behalf of the Organization Loss arising from a Claim first made against the Organization . . . for any actual or alleged Wrongful Act of the Organization." (ECF No. 1-1 at 9, 11).

The Excess Policy provided coverage "in conformance with the terms and conditions of the [D&O] Policy," except "as otherwise provided [in the Excess Policy]." (ECF No. 1-4 at 3). Specifically, the Excess Policy provided that "[i]n no event shall this Policy grant broader coverage than would be provided by any of the Underlying Insurance." *Id.* The Excess Policy "provid[ed] the Insureds with insurance during the Policy Period excess of the Underlying Limit" and coverage attached "only after the insurers of the Underlying Insurance shall have paid in legal currency the full amount of the Underlying Limit." *Id.*

---

[9] The definition of Individual Insured(s) was expanded by Endorsement #11. (ECF No. 1-3 at 6).
[10] Endorsement 28 changed the definition of the term Claim. (ECF No. 1-3 at 35).

After making a net payment to NEMC of $9,207,778.40, Lifespan sought coverage from National Union and RLI, claiming coverage for the $29,607,959.57 in damages and interest returned against Lifespan in favor of the Attorney General at the conclusion of the Underlying Suit. (ECF No. 23-9; ECF No. 1-22). National Union denied coverage based on D&O Policy exclusions 4(a), (b), (k), (m), and (n). (ECF No. 10 at 6 ¶ 44). RLI denied coverage because "no part of the Amended Judgment constitutes a covered Loss under the terms of the [D&O] Policy" and "no coverage is available under the Excess Policy in any event until the underlying limit of the [D&O] Policy has been exhausted in accordance with the terms of the policies." (ECF No. 1-23; *see also* ECF No. 4 at 5 ¶ 44). RLI concurred with and reiterated the exclusions cited by National Union. (ECF No. 1-23).

## B.    Claims

Unable to secure payment from National Union or RLI, Lifespan filed this lawsuit seeking a declaratory judgment stating that none of the exclusions relied upon by defendant insurance companies to deny coverage is applicable (Count I). (ECF No. 1 at 11-12). Lifespan also alleges breach of contract, bad faith, and breach of the common law implied covenant of good faith and fair dealing against each insurance company (Counts II, IV, and VI against National Union; Counts III, V, and VII against RLI). *Id.* at 12-19. Finally, Lifespan alleges an *Asermely* rule[11] claim against National Union (Count VIII). *Id.* at 19-20. In terms of damages, Lifespan seeks from both National Union and RLI $29,607,959.57, the amount of the Amended

---

[11] In *Asermely v. Allstate Ins. Co.*, 728 A.2d 461, 464 (R.I. 1999), the Rhode Island Supreme Court adopted a rule requiring insurers to pay any excess judgment where the insurer rejects a settlement demand within its policy limits: "If the insurer declines to settle the case within the policy limits, it does so at its peril in the event that a trial results in a judgment that exceeds the policy limits, including interest. If such a judgment is sustained on appeal or is unappealed, the insurer is liable for the amount that exceeds the policy limits, unless it can show that the insured was unwilling to accept the offer of settlement."

Judgment, as well as interest, costs, and attorneys' fees. *Id.* at 13-15. Lifespan also seeks eighty percent of all defense costs in excess of retention from National Union. *Id.* at 14. On its bad faith claims, Lifespan seeks compensatory and punitive damages from both insurance companies. *Id.* at 17-19. On the *Asermely* claim against National Union, Lifespan seeks "the full amount of the damages sustained by Lifespan to satisfy the Counterclaims of the [Attorney General] as reflected in the Amended Judgment." *Id.* at 20. Both insurance companies answered the complaint, and both deny that coverage is available for Lifespan. (ECF No. 4 at 5; ECF No. 10 at 6).

### C.    Pending Motions

All three parties have moved for summary judgment.[12] National Union filed first, arguing that there are no issues of material fact and it is entitled to judgment as a matter of law as to all of the claims asserted against it (Counts I, II, IV, VI, and VIII). (ECF No. 20). Lifespan filed next, seeking summary judgment as to Counts I, II, and III of its complaint, the declaratory judgment count and both breach of contract counts.[13] (ECF No. 22). RLI filed third, seeking summary judgment as to Counts I and III, the declaratory judgment count and the breach of contract count against it, and also seeking a declaration "that RLI does not owe [] Lifespan [] a duty to indemnify it with respect to a judgment against it in favor of [NEMC]."[14] (ECF No. 24).

## III.    STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure directs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

---

[12] The parties filed eleven briefs pertaining to summary judgment. (ECF Nos. 20-1, 22-1, 24-1, 28-1, 33, 34-1, 37-1, 40, 41, 42, 43).

[13] Lifespan did not move for summary judgment on Counts IV, V, VI, VII, or VIII, the bad faith claims and the *Asermely* claim. (ECF No. 22).

[14] RLI did not move for summary judgment on Counts V and VII, the bad faith claims. (ECF No. 24).

movant is entitled to judgment as a matter of law." When evaluating "cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund*, 736 F.3d 33, 36 (1st Cir. 2013) (quoting *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)). This case is before this Court pursuant to diversity jurisdiction, and the substantive law of the State of Rhode Island applies. *Rosciti v. Ins. Co. of Pa.*, 659 F.3d 92, 96 (1st Cir. 2011).[15]

## IV. ANALYSIS

Rhode Island courts interpret insurance policies by "applying the rules for construction of written instruments." *Allstate Ins. Co. v. Russo*, 641 A.2d 1304, 1306 (R.I. 1994); *see also Derderian v. Essex Ins. Co.*, 44 A.3d 122, 127 (R.I. 2012) (insurance policy terms interpreted in accordance with rules of construction governing contracts). "Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility." *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). "When a contract is unambiguous, [courts] review its terms in a de novo manner." *Papudesu v. Med. Malpractice Joint Underwriting Ass'n of R.I.*, 18 A.3d 495, 498 (R.I. 2011). In determining "'whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning.'" *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.*, 852 A.2d 535, 542 (R.I. 2004) (quoting *Rubery v. Downing Corp.*, 760 A.2d 945, 947 (R.I. 2000)). When no ambiguity exists in the terms of an agreement, "judicial construction is at an end for the terms will be applied as written." *Monahan v. Girouard*, 911 A.2d 666, 672 (R.I. 2006) (quoting *Rivera v. Gagnon*, 847 A.2d 280, 284 (R.I. 2004)).

---

[15] All parties agree that Rhode Island substantive law applies when interpreting the insurance contracts at issue in this case. (ECF No. 20-1 at 4-5; ECF No. 22-1 at 20-21; ECF No. 28-1 at 8).

The analysis of this insurance coverage case involves multiple steps and shifting burdens. First, the insured "bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy." *Gen. Acc. Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I. 1998).

Second, if the insured sustains its initial burden, "[t]he insurer then bears the burden of proving the applicability of policy exclusions. . . ." *Id.* "Where an insurance company seeks to deny coverage under a policy exclusion, it carries the burden of proving that the exclusion applies." *Am. Title Ins. Co. v. East West Fin.*, 16 F.3d 449, 455 (1st Cir. 1994). Under long-standing and definitive Rhode Island law, an insurance policy's exclusion from coverage "must be clear and unambiguous." *Scorpio v. Underwriters at Lloyd's, London*, No. 10-325, 2012 WL 2020168, at *3 (D.R.I. June 5, 2012) (quoting *Am. Commerce Ins. Co. v. Porto*, 811 A.2d 1185, 1192 (R.I. 2002)). This "Court also bears in mind that exclusionary clauses which are subject to more than one interpretation are to be construed in the manner most favorable to the insured, . . . and the general principle that insurance contract provisions subject to more than one interpretation are construed strictly against the insurer." *City of East Providence v. First Am. Title Ins. Co.*, No. 10-199, 2011 WL 5521246, at *6 (D.R.I. Oct. 13, 2011) (internal citations omitted) (adopted by *City of East Providence v. First Am. Title Ins. Co.*, No.10-199, 2011 WL 5527604, at *1 (D.R.I. Nov. 14, 2011)).

Third, when there is an exception to a valid exclusion, the First Circuit Court of Appeals has opined that the Rhode Island Supreme Court would find "that the insured must also prove that the exception affords coverage after an exclusion is triggered." *St. Paul Fire & Marine Ins.*

*Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1200 (1st Cir. 1994). This Court will follow this rule on exceptions to exclusions.

### Prima Facie Case Of Coverage

In this case, it is undisputed that Lifespan has made an initial prima facie case of insurance coverage: Lifespan has established the existence and validity of a policy with both defendants; the Amended Judgment constitutes a suffered loss during the policy period; and both insurance companies have refused to pay.[16]

### National Union Policy

National Union issued Policy No. 494-17-30 to Lifespan, with a policy period of October 1, 2005 to October 1, 2006. (ECF No. 1-1 at 2). This policy, referred to herein as the D&O Policy, provided three types of coverage: (A) individual insured insurance; (B) organization indemnification reimbursement insurance; and (C) organization entity coverage. *Id.* at 9. It also provided for the advancement of defense costs in certain circumstances. *Id.* The D&O Policy defined "Wrongful Act" "with respect to Individual Insureds," as "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in his/her respective capacities as such, or any matter claimed against such Individual Insured solely by reason of his/her status as Individual Insureds of [Lifespan]." *Id.* at 13. Regarding organization entity coverage, the D&O Policy defined "Wrongful Act" as "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of [Lifespan]." *Id.* The term "Loss" is defined to mean "damages, (including back pay and front pay), judgments,

---

[16] The briefing by defendant insurance companies generally overlooks this initial coverage analysis and instead focuses on their burden to prove the applicability of the exclusions. (*See, e.g.,* ECF Nos. 20-1, 24-1). This Court views their lack of argument regarding Lifespan's prima facie case as an acknowledgement that Lifespan has established a prima facie case of insurance coverage.

settlements, pre- and post- judgment interest, the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act and Defense Costs," subject to several exclusions. *Id.* at 11.

### RLI Policy

The RLI Policy is Policy No. EPG0003701. (ECF No. 1-4 at 2). It too had a policy period of October 1, 2005 to October 1, 2006. *Id.* The RLI Policy stated that it is an Excess Policy and references National Union's Policy Number 004941730 as the Primary Policy. *Id.* The RLI Policy's Amend[ed] Insuring Clause Endorsement stated that "[c]overage hereunder shall attach only after the insurers of the Underlying Insurance, or the Insureds, shall have paid in legal currency the full amount of the Underlying Limit . . . [and then] shall apply in conformance with the terms and conditions of the Primary Policy." (ECF No. 1-4 at 6).

The Loss at issue is from the Amended Judgment issued in C.A. No. 06-421, the Underlying Suit, entered on August 31, 2011. (ECF No. 24-6). The Amended Judgment is the result of the court's *Findings of Fact* dated May 24, 2011 and pursuant to its Opinion and Order dated August 26, 2011. *Id.* Lifespan was found to have been grossly negligent, committed willful misconduct, and breached its fiduciary duty through its failures to negotiate certain rates for health insurer contracts and in connection with the interest rate swap. *See, e.g., Findings of Fact* at ¶¶ 93-94, 96, 105, 136-37, 147-48, 152-54, 155. These are Wrongful Acts as that term is defined by the D&O Policy. And Lifespan has satisfied the Amended Judgment. (ECF No. 21-12).

The Loss at issue occurred during the October 1, 2005 – October 1, 2006 policy period because NEMC made a claim against Lifespan in August of 2006 and filed suit the following month. (ECF No. 23 at ¶¶ 3, 6; ECF No. 29 at ¶¶ 3, 6; ECF No. 32 at ¶¶ 3, 6). Lifespan

promptly notified National Union and RLI of the claim. (ECF No. 23 at ¶¶ 5, 7; ECF No. 29 at ¶¶ 5, 7; ECF No. 32 at ¶¶ 5, 7).

Finally, both National Union and RLI have refused to pay. By letter dated November 29, 2011, Lifespan demanded that its insurers reimburse it "in an amount equal to the balance of their coverage under their applicable policies for Lifespan's satisfaction of the amended award/judgment of . . . [$29,605,282.93] returned against Lifespan in favor of the Attorney General . . . plus post-judgment interest through October 3, 2011." (ECF No. 1-22 at 2). RLI responded by stating, "no part of the Amended Judgment constitutes a covered Loss under the terms of the [D&O Policy] or the Excess Policy" and further "no coverage is available under the Excess Policy in any event until the underlying limit of the [D&O Policy] has been exhausted in accordance with the terms of the policies." (ECF No. 1-23 at 2). National Union similarly has refused to pay. (*See, e.g.*, ECF No. 1-17).

Lifespan has met its "burden of proving a prima facie case" by establishing the "existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments." *Gen. Acc. Ins. Co.*, 716 A.2d at 757. The burden therefore shifts to defendant insurance companies to establish that Lifespan is not entitled to coverage because of a policy exclusion.

### *Exclusions*

Paragraph four of the D&O Policy[17] includes numerous exclusions, five of which are at issue in the current motions. (ECF No. 1 at 11 ¶ 44). First this Court will evaluate Exclusion (4)(a), the Unlawful Advantage Exclusion, and Exclusion 4(b), the Deliberate Fraudulent Act

---

[17] The RLI policy's Amend[ed] Insuring Clause Endorsement states that "[c]overage hereunder shall apply in conformance *with the terms and conditions of the [D&O] Policy*." (ECF No. 1-4 at 6) (emphasis added). Therefore, for purposes of analyzing the exclusions, this Court treats the Excess Policy as having the same language as the D&O Policy.

Exclusion, as they were modified together and raise similar issues. Then this Court will turn to Exclusion 4(k), the Contractual Liability Exclusion; Exclusion 4(m), the Securities Exclusion; and, finally, Exclusion 4(n), the Professional Services Exclusion. (ECF No. 1-1 at 14-15; ECF No. 1-3 at 8, 9, 17).

### A.     Exclusions 4(a) and (b) –
### Unlawful Advantage and Deliberate Fraudulent Act Exclusions

Exclusions 4(a) and (b) address an insurance company's "payment for Loss in connection with a Claim made against an Insured" involving an unlawful "advantage" or "deliberate fraud." (ECF No. 1-1 at 14; ECF No. 1-3 at 17). Mr. Lantto's involvement with the interest rate swap is the conduct that defendant insurance companies deem relevant to these exclusions.

The original language of Exclusions 4(a) and (b) was replaced by Endorsement #16. *Id.* Endorsement #16 states, in relevant part, that:

> Exclusions (a) and (b) are deleted in their entirety and replaced with the following:
>
> (a) arising out of, based upon or attributable to the gaining of any profit or advantage to which any judgment, final adjudication or binding arbitration adverse to the Insured(s) establishes the Insured(s) were not legally entitled;
>
> (b) arising out of, based upon or attributable to the committing of any criminal or deliberate fraudulent act if any judgment, final adjudication or binding arbitration adverse to the Insured(s) establishes that such criminal or deliberate fraudulent act occurred;

*Id.* Immediately following paragraph (b), Endorsement #16 states that "ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED." *Id.*

Both 4(a) and 4(b) have two parts. The first part of 4(a) pertains to "profit or advantage," while the first part of 4(b) pertains to "any criminal or deliberate fraudulent act." *Id.* The second parts are similar in that both require a "judgment, final adjudication or binding arbitration

adverse to the Insured(s)." *Id.* For either of these exclusions to bar coverage, defendant insurance companies must establish both parts.

When the D&O Policy originally issued, immediately after paragraph (b) the following language — indented and in brackets — appeared: "[The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of exclusions 4(a) through 4(b)]" (the "Bracketed Language"). (ECF No. 1-1 at 14). The D&O Policy defined "Insured(s)" as "the Organization and all Individual Insureds." (ECF No. 1-1 at 11). The term "Individual Insured(s)" included "a past, present or future duly elected or appointed director, officer, . . . staff or faculty member . . . , Employee or volunteer of the Organization." *Id.* The parties disagree as to whether the Bracketed Language remained after the issuance of Endorsement #16.

This Court will analyze Exclusion 4(a), then Exclusion 4(b), and finally turn to the Bracketed Language.

### 1. Exclusion (4)(a) - Unlawful Advantage Exclusion

The first part of Exclusion 4(a) provides that the insurance company is not liable in connection with a claim that is "(a) arising out of, based upon or attributable to *the gaining of any profit or advantage*." (ECF No. 1-1 at 14; ECF No. 1-3 at 17) (emphasis added). The second part requires a "judgment, final adjudication or binding arbitration adverse to the Insured(s) establish[ing that] the Insured(s) were not legally entitled." (ECF No. 1-3 at 17). For this exclusion to bar coverage, defendant insurance companies must prove both parts.

In the Underlying Suit, the court made the following factual findings regarding the interest rate swap transaction and the connection between Lifespan's Mr. Lantto and Morgan Stanley's Mr. Seubel:

> Unbeknownst to NEMC, Lantto had a close, longstanding personal friendship with Seubel. Lantto had worked with Seubel in the past, and Seubel had recommended Lantto for the CFO position that Lantto held before coming to Lifespan. Their business relationship had developed into a friendship because of their mutual affinity for wine. They had gone to wine tastings together, bought dinner and wine for each other on numerous occasions, and stayed overnight at each other's homes. Seubel was also part of a wine-related business partnership that Lantto wanted, but had never been invited, to join.

*Findings of Fact* at ¶ 114. The court concluded that Mr. Lantto had "a conflict of interest in the swap transaction, which resulted in preferential access for Morgan Stanley." *Id.* at ¶ 117.

Defendant insurance companies contend that Mr. Lantto's conduct in connection with the interest rate swap constitutes an unlawful advantage: he had a personal interest in the swap and he hoped that by NEMC entering into the swap, he would be invited to join Mr. Seubel's wine club. (ECF No. 20-1 at 14; ECF No. 24-1 at 26-27). Lifespan contends there was no finding that Mr. Lantto actually obtained a profit or an advantage. (ECF No. 22-1 at 34).

This Court's careful review of the *Findings of Fact* reveals that neither Mr. Lantto nor Lifespan gained any profit or any advantage from the interest rate swap.[18] Although Mr. Lantto "wanted to join [Mr.] Seubel's wine partnership and likely hoped the swap would help make that happen," there is no finding that any advantage was gained. *Id.* at ¶ 139. The fact that Mr. Lantto "wanted to" and "hoped" are insufficient to trigger Exclusion 4(a) because this exclusion requires the actual gaining of a profit or an advantage.

Furthermore, defendant insurance companies have failed to meet their burden to convince this Court that an attempt to gain entry into a wine club is legally the type of "profit or advantage" required for this exclusion to apply. *See Gen. Acc.*, 716 A.2d at 757 (insurer "bears the burden of proving the applicability of policy exclusions"). When allowing exclusions like

---

[18] To the contrary, the court in the Underlying Suit found that it was Morgan Stanley who gained a type of an advantage in that it got "preferential access" to Lifespan. *Id.*

this one in various situations, courts typically have found that the insured reaped a significant profit or advantage. *See, e.g.*, *Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742, 747 (5th Cir. 1999) (Where Cosby "maintained a forty-nine percent interest in Action Funding, Inc.," "[i]t cannot be disputed that the investment of $2 million dollars into the coffers of Action Funding accrued to Cosby's personal advantage by infusing his business with substantial investment capital with which to operate his business."); *Plainview Milk Prods. Coop. v. Westport Ins. Corp.*, 182 F. Supp. 2d 852, 852 n.1, 853, 855 (D.Minn. 2001) (in a case involving overcharging that was settled for $750,000, the "overcharged amount . . . certainly constitutes an 'advantage'"). In this case, Mr. Lantto merely hoped to be allowed into a wine club, a rather paltry possible benefit when compared with the multi-million dollar interest rate swap. This is not the type of advantage that would trigger the exclusion. At worse, Mr. Lantto had a conflict of interest and a breach of fiduciary duty, neither of which triggers this exclusion and is likely the kind of risk for which Lifespan sought D&O coverage. *See* Seth Van Aalten, *D&O Insurance in the Age of Enron: Protecting Officers and Directors in Corporate Bankruptcies*, 22 Ann. Rev. Banking & Fin. L. 457, 477 (2003) ("[T]he fundamental purpose of D&O insurance [is] affording officers and directors a necessary safeguard in performing their duties.").

Since defendant insurance companies have not established the first part of Exclusion 4(a), this exclusion cannot bar coverage. This Court therefore need not analyze its second part.

### 2. Exclusion 4(b) - Deliberate Fraudulent Acts Exclusion

Exclusion 4(b) has two requisite parts: first, the claim must be "arising out of, based upon or attributable to the committing of any criminal or deliberate fraudulent act"; and second, there must be a "judgment, final adjudication or binding arbitration adverse to the Insured(s) [that] establishes that such criminal or *deliberate fraudulent act* occurred." (ECF No. 1-3 at 17)

(emphasis added). For Exclusion 4(b) to bar coverage, defendant insurance companies must establish both parts.

In the Underlying Suit, the court found that Mr. "Lantto knowingly concealed from NEMC officials his conflict of interest in the swap transaction and bond refinancing, which was a material fact that he had a duty to disclose, by virtue of Lifespan's fiduciary relationship with NEMC." *Findings of Fact* at ¶ 154 (citing *id.* at ¶¶ 136–139). Specifically, the court explained that Mr. Lantto did the following:

> knowingly gave Morgan Stanley preferential access to NEMC, concealed from NEMC his personal relationship with Seubel, failed to recuse himself from the proposed swap transaction, pressured NEMC to enter into the swap, prohibited competitive bidding, prohibited NEMC from obtaining a timely second opinion from its chosen consultant, suppressed opposition from NEMC's CFO, advocated the swap to NEMC without discussing its risks, and falsely stated to NEMC that the swap would "lock in" current interest rates.

*Id.* at ¶ 136.

Defendant insurance companies contend that the court found facts that constitute fraud as a matter of law: "[c]ommon-law fraud consists of a false or misleading statement of material fact[19] that was known by the defendant to be false and was made with intent to deceive, upon which the plaintiff justifiably relies to its detriment." *Nisenzon v. Sadowski*, 689 A.2d 1037, 1046 (R.I. 1997); *see also* ECF No. 20-1 at 14-15; ECF No. 24-1 at 28-32. They point to the court's findings that Mr. Lantto falsely stated that NEMC would "lock in" the interest rate; he made this statement with the intent to induce NEMC to enter the interest rate swap; and his conduct was the "but for" and proximate cause of NEMC's loss. *Findings of Fact* at ¶¶ 122,

---

[19] A fact is material in this context if it "is likely to affect the conduct of a reasonable person with reference to a transaction with another person." *Dudzik v. Leesona Corp.*, 473 A.2d 762, 766-67 (R.I. 1984).

133, 136-37, 140, 147, 152-55. In addition, they reference the court's findings that Mr. Lantto knowingly concealed information, and they characterize that as a deliberate fraudulent act. *See id.* at ¶152-54.

In contrast, Lifespan focuses on the term "judgment" in the second part of the Exclusion 4(b). (ECF No. 22-1 at 44). Lifespan contends that the court did not render a judgment that Mr. Lantto committed a "criminal" act or a "deliberate fraudulent act," so this exclusion does not apply.

Analyzing the first part of Exclusion 4(b), this Court agrees with defendant insurance companies that Mr. Lantto committed a deliberate fraudulent act. There are factual findings supporting each element of fraud: he made false or misleading statements of material fact that he knew were false; he made those statements with the intent to deceive; and NEMC relied on those statements.

As to the second part of this exclusion, this Court agrees with Lifespan that there was not a "judgment, final adjudication or binding arbitration" establishing that Mr. Lantto committed a "deliberate fraudulent act." Although there were individual factual findings indicating that Mr. Lantto committed a deliberate fraudulent act, there was no "judgment, final adjudication or binding arbitration" establishing a deliberate fraudulent act. Rather, the judgment adverse to Lifespan was for breach of fiduciary duty and contractual indemnification under the Restructuring Agreement. Neither of these two causes of action for which judgment entered requires an element of fraud. There was no judgment establishing deliberate fraudulent conduct, nor was there any final adjudication of fraud.

For this exclusion to bar coverage, defendant insurance companies must bear the burden as to both parts. Every word must be given meaning. *See Andrukiewicz v. Andrukiewicz*, 860

A.2d 235, 239 (R.I. 2004) ("When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected."). The second clause of Exclusion 4(b) begins with the word "if." The plain meaning of this term dictates that the first part of the exclusion only applies *if* the second part is established. Since there is not a "judgment, final adjudication or binding arbitration" establishing that Mr. Lantto committed a "deliberate fraudulent act," (*e.g.,* there is no judgment on a fraud count), defendant insurance companies have not met their burden to show that Exclusion 4(b) bars coverage.

### 3.     The Bracketed Language

Even if Exclusion 4(a) or 4(b) barred coverage, the Bracketed Language would apply so there would be coverage. The Bracketed Language states, "The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of exclusions 4(a) through 4(b)." (ECF No. 1-1 at 14). There are two ways to read the D&O Policy after Endorsement #16: with the Bracketed language as distinct from Exclusions (a) and (b) and therefore remaining as part of the D&O Policy; or with the Bracketed Language as part of Exclusions (a) and (b) and therefore deleted from the D&O Policy.

Lifespan views the Bracketed Language as remaining in the D&O Policy because of the language at the bottom of Endorsement #16 stating, "ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED." (ECF No. 22-1 at 38-39). Since Lifespan views the Bracketed Language as distinct from Exclusions (a) and (b), the Bracketed Language was not impacted by Endorsement #16 and remains in the D&O Policy. Defendant insurance companies contend that the Bracketed Language was eliminated from the D&O Policy because the language at the top of Endorsement #16 states, "Exclusions (a) and (b) are deleted in their

entirety." (ECF No. 20-1 at 15; ECF No. 42 at 7-8). In their view, the Bracketed Language was deleted because it was part of Exclusions (a) and (b).

Under Rhode Island law, when "the terms of an insurance contract are subject to more than one reasonable interpretation, the insurance contract will be strictly construed against the insurer." *Textron, Inc. v. Aetna Cas. & Sur. Co.*, 638 A.2d 537, 539 (R.I. 1994) (citing *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 552 (R.I. 1990)). National Union, as the drafter of the D&O Policy, had the opportunity to draft Endorsement #16 in such a way that it was clear whether the Bracketed Language survived or not. Instead, National Union drafted a policy that reasonably can be read two ways. This Court must and therefore does construe it against National Union and finds that the Bracketed Language survives Endorsement #16 and remains as part of the D&O Policy.[20]

Having determined that the Bracketed Language remains part of the D&O Policy, this Court next must determine what it means and what impact, if any, it would have on Exclusions 4(a) and 4(b). First of all, the Bracketed Language is drafted in such a way that this Court considers it an exception to Exclusions 4(a) and (b). As an exception to an exclusion, Lifespan has the burden of proving that "that the exception affords coverage after an exclusion is triggered." *St. Paul Fire*, 26 F.3d at 1200.

Giving the Bracketed Language "its plain, ordinary and usual meaning," *Garden City*, 852 A.2d at 542 (quoting *Rubery*, 760 A.2d at 947), this Court finds that "The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the

---

[20] This determination is consistent with the impact of Endorsement #16: it deletes the term "in fact" and adds language requiring a final judicial determination or arbitral award adverse to the insured. (*Compare* ECF No. 1-1 at 14 *with* ECF No. 1-3 at 17). Through these changes, Endorsement #16 narrows Exclusions (a) and (b), and that has the effect of increasing coverage. Keeping the Bracketed Language in the Policy also increases coverage.

applicability of exclusions 4(a) through 4(b)" means that the wrongful act of one Insured cannot be imputed to another Insured. In this context, it means that the Wrongful Acts of Mr. Lantto cannot be imputed to Lifespan.

This Court is not persuaded by the insurance companies' arguments that this plain meaning of the D&O Policy would eliminate the applicability of these exclusions for insured corporations. While their point that corporations act through human beings is well taken,[21] National Union drafted the D&O Policy. If National Union wanted bad acts from one Insured to be imputed to another Insured in the context of these exclusions, then it should have included imputation language in Exclusions 4(a) and 4(b).[22] However, no such language exists in this section of the D&O Policy.

Defendant insurance companies contend that this is not an imputation case since paragraph 46 of the *Findings of Fact* states that Lifespan committed intentional misconduct and elsewhere in the *Findings of Fact* it notes that Lifespan made misrepresentations. However, those statements in context show that they arise from the court's adherence to both the indemnification provisions of the Restructuring Agreement and the "ordinary principles of agency." *Findings of Fact* at ¶ 46, n.28, ¶ 151 (internal quotation marks and citations omitted). The court was focused on the language of the Restructuring Agreement's indemnification clause because it was the vehicle for Lifespan to indemnify NEMC. *See, e.g.*, *id.* at ¶ 39, 42. Notably, those indemnification provisions apply to losses "arising out of or directly or indirectly relating to" both "Lifespan's willful misconduct or gross negligence in the provision of services to NEMC by Lifespan *employees*" and "[a]ny misrepresentation by Lifespan, or any breach or

---

[21] *See TranSched Sys. Ltd. v. Federal Ins. Co.*, 958 F. Supp. 2d 331, 337 (D.R.I. 2013).

[22] A review of the D&O Policy shows that Endorsement #14 contains a modified imputation clause while this section does not. (*See* ECF No. 1-3 at 13). If National Union wanted an imputation clause pertaining to Exclusions (a) and (b), it could have included one.

failure of any covenant, or any breach of inaccuracy made by or *on behalf of* Lifespan in the Agreement . . . ." (ECF No. 21-9 at 35) (emphases added). Lifespan therefore had to indemnify NEMC for conduct by its employees and those acting on its behalf.[23] Further, the court applied "ordinary principles of agency" that hold a corporation "vicariously liable for the tortious conduct of its employee committed within the scope of his employment." *Findings of Fact* at n.28 (internal quotation marks and citations omitted). This Court is focused on actual *factual* findings below, and there are no *factual* findings that anyone other than Mr. Lantto committed intentional misconduct. Defendants' reliance on the court's shorthand terminology that Lifespan itself made misrepresentations therefore is misplaced because the factual findings in the Underlying Suit show misconduct conducted by Mr. Lantto only.

Although this Court found that Exclusion 4(a) is not a bar to coverage, even if one concluded that the Loss in connection with the interest rate swap was attributable to Mr. Lantto's "gaining of any profit or advantage," the Bracketed Language prevents Mr. Lantto's conduct from being imputed to Lifespan. In other words, even if Mr. Lantto was found to have gained a profit or advantage, the exception to the exclusion would apply and coverage would remain because Mr. Lantto's conduct cannot be imputed to Lifespan due to the Bracketed Language in the D&O Policy.

Turning to Exclusion 4(b), this Court found that the loss in connection with the interest rate swap was "arising out of, based upon or attributable to the committing of any [] deliberate fraudulent act" but there was no "judgment, final adjudication or binding arbitration adverse to the Insured(s)" that established such fraud. (ECF No. 1-3 at 17). However, even if one

---

[23] The court found that Mr. "Lantto was a Lifespan employee working under the supervision and direction of Lifespan employees during the affiliation when he provided services to NEMC relating to the refinancing and swap." *Findings of Fact* at ¶ 146.

concluded that there was a "judgment, final adjudication or binding arbitration adverse to" Lifespan establishing such fraud, the Bracketed Language would apply such that there would be coverage.

In the Underlying Suit, the court found Lifespan liable for Mr. Lantto's acts based on "ordinary principles of agency" whereby "a corporation is vicariously liable for the tortious conduct of its employee committed within the scope of his employment." *Findings of Fact* at n.28 (internal quotation marks and citation omitted). There were no factual findings that anyone other than Mr. Lantto committed deliberate fraudulent conduct.

Here, the Bracketed Language prevents this Court from imputing the deliberate fraudulent conduct of Mr. Lantto, an Insured, to Lifespan, another Insured. Since the only findings of deliberate fraudulent conduct were done by Mr. Lantto, and that conduct cannot be imputed to Lifespan, even if Exclusion 4(b) applied, the exception to the exclusion is satisfied so there is insurance coverage.

In sum, Lifespan has sustained its burden of proving the applicability of the Bracketed Language. Mr. Lantto's wrongful acts, notably in contravention of Lifespan's policies,[24] "shall *not* be imputed to [Lifespan] for the purposes of determining the applicability of exclusions 4(a) through 4(b)." (ECF No. 1-1 at 14) (emphasis added). Because the Bracketed Language survived Endorsement #16 and remains in the D&O Policy, Exclusions 4(a) and 4(b) would not bar coverage in this case even if these exclusions were applicable.

## B.     Exclusion 4(k) – Contractual Liability Exclusion

Defendant insurance companies claim that any judgment in the Underlying Suit against Lifespan is excluded from coverage because it arises out of a failure to perform contractual

---

[24] *See id.* at ¶¶ 115-16.

obligations in the Affiliation Agreement. (ECF No. 20-1 at 10-13; ECF No. 24-1 at 18-23). Lifespan counters that it did not have any contractual liability to NEMC in the Underlying Suit and therefore this exclusion is inapplicable. (ECF No. 22-1 at 46-53). This Court must determine whether the judgment in favor of the Attorney General's claim for breach of fiduciary duty by Lifespan arose out of the "contractual liability" of Lifespan.

Exclusion 4(k), located in Endorsement #11, excludes from coverage a Loss in connection with a claim

> (k) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Organization or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon the termination of any Insured); provided, however, that this exclusion shall not apply to:
> (1) Employment Practices Claims to the extent that any liability does not arise from such express contract or agreement; or
> (2) Claims for Loss alleging Wrongful Acts of an Insured(s) with respect to hospital practice privileges, credentialing or peer review matters;

(ECF No. 1-3 at 8).

This Court finds that defendant insurance companies have failed to meet their burden to establish that Exclusion 4(k) applies because the judgment: (i) could not have arisen from contractual liability because any and all contractual liability between NEMC and Lifespan was released before the claims were made in the Underlying Suit and before judgment was imposed; and (ii) even if contractual liability had not been released, the exclusion still would not apply because the claims against Lifespan are based on the Attorney General's breach of fiduciary claim, a claim that does not arise from contractual liability of Lifespan.

## 1. Contractual Liability Released Before Claims Asserted

Defendant insurance companies' reliance on Exclusion (k) fails because Lifespan had no contractual liability to NEMC under the Affiliation Agreement at the time of the Underlying Suit. There was no contractual liability because in the Restructuring Agreement, Lifespan and NEMC released all contract claims that existed between them arising from the Affiliation Agreement. The release states that NEMC "hereby releases, remises and forever discharges any and all rights and claims that [it] has had, now has, might now have or might in the future have against Lifespan . . . or their officers, directors, employees and agents arising from or in connection with the [Affiliation Agreement]." (ECF No. 21-1 at 29-30).

Since NEMC released Lifespan of all contract claims that arose from the Affiliation Agreement, no contractual liability existed for Lifespan at the time of the filing and subsequent judgment in the Underlying Suit for which Lifespan seeks coverage. Without any contractual liability, Exclusion 4 (k) has no application.

Moreover, defendant insurance companies' argument concerning the scope of this exception is misplaced because they consistently ignore the phrase "contractual liability" and instead substitute the word "contract." The issue is not whether the liability of Lifespan arose out of a "contract," but rather whether the liability of Lifespan arose out of its "contractual liability." In fact, many of the cases upon which the defendant insurance companies rely dealt with policies that excluded claims that arose out of "contracts" and not out of an insured's "contractual liability."[25] Any such attempt by the insurance companies to rewrite the exclusion

---

[25] *See, e.g.*, ECF No. 20-1 at 12; ECF No. 28-1 at 10-11; *Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 625 (9th Cir. 1996); *Cousins Submarines, Inc. v. Fed. Ins. Co.*, No 12-CV-387-JPS, 2013 WL 2898774, at *1 (E.D. Wis. June 8, 2013); *Callas Enters., Inc. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 955 (8th Cir. 1999); *Medill v. Westport Ins. Co.*, 143 Cal. App. 4th 819, 829 (2nd Dist. 2006).

and ignore key words is inappropriate and violates long-standing axioms of contract interpretation. *See Andrukiewicz*, 860 A.2d at 239 ("When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected."). Because Lifespan could not have any contractual liability due to the release of all claims that arose from the Affiliation Agreement, Exclusion 4(k) has no application to Lifespan's attempt to seek indemnity for the judgment against it.

### 2. Judgment For The Attorney General's Breach Of Fiduciary Duty Claim

Defendant insurance companies also attempt to satisfy their burden of proof as to the applicability of this exclusion by alleging that the Massachusetts Attorney General's claim that Lifespan violated its fiduciary duty to another non-profit arose out of contractual liability on Lifespan's part. Defendant insurance companies contend that this exclusion bars coverage because the judgment on the Attorney General's fiduciary duty claim arose from, and is attributable to, Lifespan's contractual liability to NEMC under the Affiliation Agreement. They emphasize that Rhode Island courts interpret the term "arising out of" very broadly, to mean "flowing from" or "having its origin in." (*See, e.g.*, ECF No. 28-1 at 9-10; ECF No. 33 at 11). Defendant insurance companies assert, "Lifespan's obligation to provide services for the benefit of NEMC arose exclusively pursuant to the 1997 Affiliation Agreement." (ECF No. 20-1 at 12). Further, they argue, "Lifespan's liabilities to NEMC all indisputably arose out of, were based upon and/or were attributable to Lifespan's contractual obligations to and control over NEMC." (ECF No. 24-1 at 23). According to the defendant insurance companies, "[b]ut for Lifespan's failure to perform under the contract, [] there could not possibly have been a breach of fiduciary claim by the Attorney General based on [either the] failure to renegotiate NEMC's payor

contracts [or Mr.] Lantto's provision of services related to the rate swap transaction." (ECF No. 20-1 at 12).

Lifespan counters that its obligation to the Attorney General did not arise out of "contractual liability" but rather is independent of the contract and arose from the "faith, confidence and trust" that NEMC placed in Lifespan. (ECF No. 34-1 at 9) (citing *Findings of Fact* at ¶30). Lifespan points to the court's ruling in the Underlying Suit stating "'the fact that [the parties] entered into an . . . agreement . . . does not relieve [Lifespan] of the high fiduciary duty' imposed by tort law." *Lifespan Corp. v. New England Med. Ctr., Inc.*, 731 F. Supp. 2d 232, 241 (D.R.I. 2010) (quoting *Blank v. Chelmsford Ob/Gyn, P.C.*, 649 N.E.2d 1102, 1106 (Mass. 1995)); *see also Findings of Fact* at ¶ 30. Since the Attorney General's breach of fiduciary duty claim is not an obligation under the Affiliation Agreement and did not arise because of it, Lifespan contends that Exclusion 4(k) does not bar coverage.

This Court first will focus on the claim in the Underlying Suit that subjected Lifespan to liability, and then turn to the language of Exclusion 4(k). The claim at issue is the Attorney General's breach of fiduciary duty claim. When she moved to intervene, the Attorney General referenced her "exclusive statutory authority to represent the public interest in the due application of charitable funds, in enforcing the fiduciary duties which plaintiff Lifespan [] owed to the defendant Massachusetts public charit[y], [NEMC]." (ECF No. 78 at 1 in 06-cv-421). She argued that "NEMC [could not] adequately represent the Attorney General's interests in enforcing Lifespan's fiduciary duties to NEMC." *Id.* at 6. The court granted her motion to intervene based on this independent status and obligation of the Massachusetts Attorney General. (3/31/2009 and 4/17/2009 Text Orders in 06-cv-421).

Originally, both NEMC and the Attorney General were pressing the breach of fiduciary duty claim. (ECF No. 114 in 06-cv-421). In deciding motions for partial summary judgment in the Underlying Suit, The court noted, "a fiduciary relationship generally 'exists when one reposes faith, confidence, and trust in another's judgment and advice.'" *Lifespan*, 731 F. Supp. 2d at 239 (quoting *Doe v. Harbor Schs., Inc.*, 843 N.E.2d 1058, 1064 (Mass. 2006)). Then the court found "that Lifespan owed a fiduciary duty to NEMC during their affiliation." *Id.* at 241.

In the Underlying Suit, Lifespan sought summary judgment on NEMC's breach of fiduciary duty claim because, in the Restructuring Agreement, NEMC released "any and all rights and claims that [it] has had, now has, might now have or might in the future have against Lifespan . . . arising from or in connection with" the Affiliation Agreement. (ECF No. 21-9 at 29-30). The court agreed with Lifespan, finding that "the phrase 'arising from or in connection with' is usually interpreted to mean that the parties intended for the release to extend beyond mere contract claims" and since "NEMC's tort claims are all very closely connected to the Affiliation Agreement," "they are encompassed by the plain meaning of the release." *Lifespan*, 731 F. Supp. 2d at 242 (citation omitted).

Since the Attorney General was not a party to the Affiliation Agreement, the release was not a bar to her breach of fiduciary duty claim. *Id.* at 243. The court explained that the Attorney General had standing to press the claim independently of NEMC because of her "'common-law duty and a specific statutory mandate to protect the public interest and enforce public rights' in the administration of non-profit organizations." *Id.* at 243 n.7 (quoting *Ciardi v. F. Hoffmann– La Roche, Ltd.*, 762 N.E.2d 303, 314 n.21 (Mass. 2002) and citing Mass. Gen. Laws ch. 12, § 8)). Regarding the scope of the fiduciary duty, the court noted that entering into an agreement

such as the Affiliation Agreement did "'not relieve [Lifespan] of the high fiduciary duty' imposed by tort law." *Lifespan*, 731 F. Supp. 2d at 241 (quoting *Blank*, 649 N.E.2d. at 1106).

In its *Findings of Fact*, the court explained, "[a] fiduciary duty exists when one reposes faith, confidence, and trust in another's judgment and advice." *Findings of Fact* at ¶ 30 (quoting *Harbor Schools*, 843 N.E.2d at 1064). The court noted that Lifespan's fiduciary duty arose both by virtue of Lifespan's "control over a non-profit hospital" and by virtue of "the faith, confidence, and trust that NEMC placed in its judgment." *Findings of Fact* at ¶ 30. The court explained that a fiduciary duty "includes both (1) a duty of loyalty and (2) a duty of care." *Id.* at ¶ 31 (citations omitted). The court also found that the Attorney General's case was not "derivative" of NEMC's claim, but rather the Attorney General's claim is a "different claim." (Tr. of Final Pretrial Conference & Motions in Limine, Jan. 31, 2011, ECF No. 205 at 65, 75, in 06-cv-421 ("*Final Pretrial Tr.*").[26] Ultimately, the court found that Lifespan had breached its fiduciary duty to NEMC in connection with payor contracting and the interest rate swap. *Id.* at ¶¶ 93-94, 96, 136-37. The court "award[ed] $14,176,704 to NEMC and the Attorney General on their counterclaims against Lifespan." *Findings of Fact* at IX.

This Court holds, just at the court below found, that the Attorney General's breach of fiduciary duty claim was not derivative of a contract claim, *see Final Pretrial Tr.* at 65, and did not arise from contractual liability under the Affiliation Agreement, but rather arose because of the special relationship created by "the faith, confidence, and trust that NEMC" had in

---

[26] While the court did state that "NEMC's tort claims are very closely connected to the Affiliation Agreement," *Lifespan*, 731 F. Supp. 2d at 242, the court did not state that the Attorney General's claims are connected at all to Lifespan's "*contractual liability*" from the Affiliation Agreement.

Lifespan.[27] *Findings of Fact* at ¶ 30; *see also Julio & Sons Co. v. Travelers Cas. & Sur. of Am.*, 591 F. Supp. 2d 651, 663-64 (S.D.N.Y. 2008).

Turning to the D&O Policy, the critical question is whether this breach of fiduciary claim is "arising out of, based upon or attributable to any actual or alleged *contractual liability* of [Lifespan]." (ECF No. 1-3 at 8) (emphasis added). As this is an exclusion, defendant insurance companies bear the burden of proving that it applies and the exclusion "must be clear and unambiguous." *Am. Title Ins. Co.*, 16 F.3d at 455; *Scorpio*, 2012 WL 2020168, at *3 (quoting *Porto*, 811 A.2d at 1192).

"It is well settled that it is the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of proper proceedings." *Dillaway v. Burton*, 153 N.E. 13, 16 (Mass. 1926). It is the Attorney General's "duty to see that the public interests are protected and to proceed in the prosecution or to decline so to proceed as those interests may require." *Id.* A fiduciary "duty is one imposed by law because of the nature of the relationship and not because of an agreement between the parties." *Kirley v. Kirley*, 521 N.E. 2d 1041, 1042 (Mass. App. Ct. 1988). Here, the Attorney General, citing this function, intervened and succeeded in prosecuting a breach of fiduciary duty claim. In the Underlying Suit, the court ruled that the Attorney General could press the breach of fiduciary duty claim independent of NEMC and independent of the Affiliation Agreement because of her "'common-law duty and a specific statutory mandate to protect the public interest and enforce public rights'

---

[27] Moreover, "'courts have reached differing conclusions on whether tort claims arising from the insured's contractual relationship should also be excluded from coverage.'" *Fed. Ins. Co. v. KDW Restructuring & Liquidating Servs., LLC*, 889 F. Supp. 2d 694, 702 (M.D. Pa. 2012) (appeal dismissed Jan. 28, 2013) (quoting 2-25 Liability of Corporate Officers & Directors, § 25.02 (Matthew Bender & Co., Inc., 2011)).

in the administration of non-profit organizations." *Lifespan*, 731 F. Supp. 2d at 243 n.7 (quoting *Ciardi*, 762 N.E.2d at 314 n.21).

The U.S. Court of Appeals for the Third Circuit, with regard to the same Exclusion (k), asserted by the same defendant as in this case, National Union, held that a breach of fiduciary duty occurring in the context of an alleged agreement entered into by its insured, "simply does not invoke the contractual liability exclusion." *Foodtown Inc. v. Nat'l Union Fire Ins. Co of Pittsburgh, PA*, 412 Fed.Appx. 502, 506 (3rd Cir. 2011). The Third Circuit concluded that the breach of fiduciary duty count did "not fall within the Section 4(k) exclusion." *Id.* at 505, 506. This Court agrees with the Third Circuit's ruling and its findings that National Union's Exclusion 4(k) does not apply to a breach of fiduciary duty claim, even if it occurs within the context of a contract or agreement.

In general, "D & O insurance is a specialized form of coverage for (i) claims against corporate directors and officers based on acts committed in their corporate capacities; [and] (ii) the corporation's indemnification obligations to its directors and officers for such claims . . . The availability of such insurance is important in attracting persons to serve as directors and officers of corporations." *Aug. Entm't, Inc. v. Phila. Indem. Ins. Co.*, 146 Cal. App. 4th 565, 573-74 (2007) (internal quotation marks and citations omitted). The D&O Policy at issue here provided coverage for Wrongful Acts such as "any *breach of duty*, neglect, error, misstatement, misleading statement, omission or act by such Insureds in his/her respective capacities as such." (ECF No. 1-1 at 13) (emphasis added). Lifespan therefore purchased insurance for breaches of fiduciary duty by its directors and officers, and finding otherwise would negate the very type of risk for which Lifespan obtained coverage.

The Attorney General was not party to the Affiliation Agreement between Lifespan and NEMC. The Attorney General's exercise of her duty to protect the public interest in connection with the administration of non-profit organizations has no connection with Lifespan's contractual liability. Defendant insurance companies have failed to meet their burden to demonstrate that the Attorney General's independent breach of fiduciary duty claim is "based upon or attributable to any actual or alleged contractual liability." As such, coverage for the Attorney General's breach of fiduciary claim is not excluded by Exclusion 4(k), the Contractual Liability Exclusion.

### C. Exclusion 4(m) – Securities Exclusion

Exclusion 4(m) pertains to claims related to the purchase or sale of securities. Whether this exclusion applies depends on which law defines the term "security" and whether the interest rate swap falls within that definition. Exclusion 4(m) states that "[t]he Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an insured . . .

> (m) alleging, arising out of, or in any way relating to any purchase or sale of *securities* by the Named Organization, Subsidiary or Affiliate or Claims brought by securities holders of the Organization in their capacity as such; provided, however, this exclusion *shall not apply* to the issuance by the Organization of tax exempt bond debt or Claims brought by tax exempt bond debt holders.

(ECF No. 1-1 at 14, 15) (emphases added).

The *Findings of Fact* explain the interest rate swap: "NEMC would agree to pay Morgan Stanley a fixed interest rate, and Morgan Stanley would agree to pay NEMC a variable interest rate (based on a swap rate index), on a notional amount roughly equal to the amount of NEMC's bonds." *Findings of Fact* at ¶ 110. When the swap terminated, "whichever party had the higher balance would pay the difference." *Id.* "[I]f the variable rate went up, Morgan Stanley would

make a payment to NEMC. *Id.* "Conversely, if the variable rate went down, NEMC would make a payment to Morgan Stanley." *Id.*

Lifespan argues that under federal law in effect at the time of the interest rate swap, specifically 15 U.S.C. §§ 77b-1(b)(1), 78c-1(b)(1), the interest rate swap is not a security. (*See, e.g.*, ECF No. 22-1 at 56-57). Lifespan also contends that New York law, specifically McKinney's UCC § 8-102, applies because the interest rate swap was governed by New York law pursuant to the Master Agreement governing the interest rate swap. (ECF No. 34-1 at 16). According to Lifespan, under either federal law or New York law, the interest rate swap is not a "security" so Exclusion 4(m) does not bar coverage. *Id.* Lifespan posits that even under Rhode Island law, specifically the definition of "security" in R.I. Gen. Laws § 6A-8-102(a)(15), the interest rate swap at issue is not a "security." (ECF No. 22-1 at 56). Finally, Lifespan asserts that even if the interest rate swap was a "security," the tax-exempt bond debt exception to the exclusion provides coverage. (ECF No. 34-1 at 16-17).

Defendant insurance companies contend that Rhode Island law applies, but they point to a different statute than the one cited by Lifespan. (ECF No. 28-1 at 20; ECF No. 20-1 at 18-19). They emphasize that "the variable rate that Morgan Stanley paid to NEMC as part of the refinancing plan was based on the Municipal Swap Index, and [] the swap involved refinancing of NEMC's revenue bonds." (ECF No. 40 at 10). Based on these facts, they contend that under § 7-11-101(22) of Rhode Island's General Laws the interest rate swap is a security because it "was an 'interest in or based on' revenue bonds -- evidence of indebtedness -- that NEMC had issued and wanted to refinance." (ECF No. 28-1 at 20 (quoting R.I.G.L. § 7-11-101(22)). Under § 7-11-101(22), therefore, defendant insurance companies assert that the interest rate "swap involved the purchase or sale of securities." (ECF No. 40 at 10).

41

Like Lifespan, defendant insurance companies do not confine their arguments to Rhode Island law. They point to the Securities Exchange Act's definition of "interest-rate swap as a type of security," (ECF No. 24-1 at 30), and note that federal law has changed over time on this issue: with the passage of the Commodities Futures Modernization Act of 2000, "a security based swap was not a 'security'"; but with the passage of the Dodd-Frank Act in 2010, "the term 'security' specifically includes a 'security-based swap.'" (ECF No. 33 at 20; *see also* ECF No. 20-1 at 19). In contrast, defendants note, Rhode Island did not change its law in 2000. (ECF No. 20-1 at 19).

Although the D&O Policy is governed by Rhode Island law, this Court is charged with ascertaining whether a particular transaction is excluded from coverage. Since the Master Agreement between Morgan Stanley governs that transaction and NEMC dated January 15, 2002, this Court begins its analysis there. (ECF No. 23-10). The Master Agreement states that it "will be governed by and construed in accordance with the law specified in the Schedule." *Id.* at 14. Part 3(f) of the Schedule specified that the "Agreement, each Credit Support Document and each Confirmation will be governed by and construed in accordance with the laws of the State of New York, without reference to its choice of law doctrine." *Id.* at 24. Since the interest rate swap was defined and controlled by New York law according to the agreement that spawned the transaction, this Court looks to New York law to evaluate whether the interest rate swap was a security.[28]

---

[28] It is very appropriate to look at the law that defined the transaction itself. By analogy, imagine that an individual over the age of 21 entered into a contract governed by Rhode Island law stating that the individual will not engage in any illegal activity. Then the individual goes to Denver, Colorado, and, while in a private home there, smokes a small amount of marijuana. Colorado law governs the act of smoking marijuana, and its law someone over 21 can smoke some marijuana in a private home. *See* Colo. Const. Art. XVIII, § 16. Even though Rhode

1.    **New York Law**

McKinney's Uniform Commercial Code § 8-102 provides the following definition:

(15) "Security", except as otherwise provided in Section 8-103, means an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:
>    (i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;
>    (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and
>    (iii) which:
>>        (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or
>>        (B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article.

The Court of Appeals of New York has explained that to be a security under this definition, an interest rate swap "must fulfill the requirements of subparagraphs (i) (the transferability test), (ii) (the divisibility test) and (iii) (the functional test)." *Highland Capital Mgmt. LP v. Schneider*, 866 N.E.2d 1020, 1024 (N.Y. 2007).

Under the transferability test, the interest rate swap first must be an obligation or interest that is "represented by a security certificate in bearer or registered form." *Id.* (quoting U.C.C. § 8-102(15)(i)). This Court reviewed the Master Agreement and found no mention of a security certificate in bearer or registered form. (ECF No. 23-10). If there were such a certificate, then this Court "must next look at whether 'a transfer of the security *may be* registered upon books maintained for that purpose by or on behalf of the issuer,' as required by section 8–102(a)(13)(ii) (emphasis added)." *Highland Capital*, 866 N.E.2d at 1025. As to this question, the New York Court of Appeals follows the Second Circuit's determination "that the proper inquiry is whether the [certificate] *could have been* registered on transfer books maintained by [the issuer], not

---

Island law governs the contract, there is no breach because the activity would have been legal where it happened.

whether they were registered on transfer books at the time of the litigation." *Id.* (quoting *Highland Capital Mgmt. LP v. Schneider*, 460 F.3d 308, 314 (2nd Cir. 2006)). Here, there is no indication that anything could have been registered in Lifespan's transfer books.[29]

Although this Court has found that the interest rate swap is not a security under New York law because the interest rate swap does not satisfy the transferability test, this Court nevertheless for the sake of completeness will review the two additional tests under New York law. Turning to the divisibility test, this Court must assess whether the interest rate swap is an obligation or interest that "is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations." McKinney's U.C.C. § 8-102(15)(ii). The Master Agreement states that "[t]he parties and their Affiliates intend that all Transactions and Specified Transactions shall be treated as mutual and a single, indivisible contractual and business relationship." (ECF No. 23-10 at 26). As such, it also does not appear that that interest rate swap could satisfy the divisibility test. Finally, the functional test requires that the interest rate swap is an obligation or interest that either "(A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article." McKinney's U.C.C. § 8-102(15). In this case, the interest rate swap does not appear to have been dealt or traded on exchanges or markets and it does not by its terms provide that it is a security governed by the UCC. The functional test therefore is also not met.

To be a security under New York law, the interest rate swap must fulfill all three requirements. Defendant insurance companies bear the burden of proving the applicability of

---

[29] In addition, the Master Agreement limits transfers in all but two situations: (a) a transfer of the Master Agreement is permissible pursuant to a merger or consolidation of all or substantially all the assets of one party; and (b) a transfer of an interest in an amount payable is permissible if there is a defaulting party. (ECF No. 23-10 at 12).

this exclusion, and they have failed to show that the interest rate swap satisfies any of the three requisite tests under New York Law. Since the interest rate swap is not a "security" under New York law, Exclusion 4(m) does not bar coverage because the interest rate swap does not "aris[e] out of, or in any way relat[e]to any purchase or sale of securities."

### 2. Rhode Island Law

Even if Rhode Island law governed this Court's analysis of the interest rate swap, Exclusion 4(m) would not bar coverage. Defendant insurance companies point to R.I.G.L. § 7-11-101(22), the definition of "security" in the Rhode Island Uniform Securities Act. Lifespan relies on R.I.G.L § 6A-8-102(a)(15), the definition of "security" in the Uniform Commercial Code. Since the term "securities" in Exclusion 4(m) can be read as having two different meanings under Rhode Island's statutes, this Court must construe it "strictly [] against the insurer. *See, e.g., Textron*, 638 A.2d at 539. In this case, that means this Court must utilize the narrower definition of "security" found in § 6A-8-102(a)(15). This language mirrors New York's definition. *Compare* R.I.G.L. § 6A-8-102(a)(15) *with* McKinney's U.C.C. § 8-102(15).

For the reasons explained *supra* regarding the New York statute, defendant insurance companies have not satisfied their burden to show that interest rate swap is a "security" as that term is defined by R.I.G.L. § 6A-8-102(a)(15). Therefore, also under Rhode Island law, Exclusion 4(m) is inapplicable because the interest rate swap was not "arising out of, or in any way relating to any purchase or sale of securities."

### 3. Federal Law

Lifespan contends that federal law applies, specifically 15 U.S.C. §§ 77b-1(b)(1) and 78c-1(b)(1) in effect at the time of the interest rate swap. While defendant insurance companies contend that federal law does not govern, they do not appear to dispute that under those statutes

as they existed in of January 2002, the interest rate swap was not a security. (*See* ECF No. 33 at 20, ECF No. 20-1 at 19). This Court agrees and finds that if those federal statutes govern, then the interest rate swap was not a security so Exclusion 4(m) would not eliminate coverage.

In sum, this Court finds that if New York law governs the question of whether the interest rate swap was a "security," then under McKinney's U.C.C. § 8-102(15), the interest rate swap was not a security. Moreover, if Rhode Island law controls that question, then the definition of "security" in R.I.G.L. §6A-8-105(15) governs and the interest rate swap is not a security. Finally, if federal law applied, under 15 U.S.C. §§ 77b-1(b)(1) and 78c-1(b)(1) in effect in January of 2002, the interest rate swap also would not be a security.[30] Since the interest rate swap was not a security, Exclusion 4(m) does not bar coverage.

### 4.    Exception to the Exclusion

Lastly, even if the interest rate swap was a "arising out of, or in any way relating to any purchase or sale of securities," there would be coverage because of the tax-exempt bond debt exception to the exclusion. Exclusion 4(m) states that it "shall not apply to the issuance by the Organization of tax exempt bond debt or Claims brought by tax exempt bond debt holders."

---

[30] Defendant insurance companies also reference a letter dated June 5, 2007 written by Lifespan's prior outside counsel stating that "[t]here would be no coverage in regard to the specific claim of a 'Wrongful Act' in regard to the alleged Interest Rate Swap Transaction, because that would involve a purchase or sale of securities in some fashion." (ECF No. 21-14 at 10; ECF No. 24-1 at 30; ECF No. 33 at 19). They argue that based on this communication, Lifespan has waived any claim for coverage for a loss on account of the interest rate swap. (ECF No. 24-1 at 30; ECF No. 33 at 19). Lifespan responds that at the time of that letter, it had not yet sustained a Loss so "there could not possibly be any waiver." (ECF No. 37-1 at 14; *see also* ECF No. 34-1 at 15). Regardless, Lifespan argues that by failing to include the defense of waiver, National Union has forfeited this defense pursuant to Rule 8(c)(1) of the Federal Rules of Civil Procedure. (ECF No. 34-1 at 15-16).

This Court does not deem the June 5, 2007 letter by Lifespan's prior outside counsel as binding Lifespan's litigation position. The letter was sent several years before the Amended Judgment entered on August 31, 2011, and well before the parties received the May 24, 2011 *Findings of Fact*.

(ECF No. 1-1 at 15). The interest rate swap, as described by the court in the Underlying Suit, was "a bond refinancing proposal" presented to NEMC by Morgan Stanley. *Findings of Fact* at ¶ 109. The interest rate swap was terminated in November 2002 and NEMC "refinanced the bonds through Merrill Lynch," ultimately "sav[ing] only $681,209 on the refinancing, relative to its existing bond payment obligations." *Id.* at ¶ 130. Based on these facts from the Underlying Suit, Lifespan has met its burden to show that the interest rate swap's refinancing of the tax-exempt bond debt of non-profit NEMC was part of "the issuance . . . of tax-exempt bond debt." Consequently, even if the interest rate swap was "arising out of, or in any way relating to any purchase or sale of securities," there is insurance coverage because of the tax-exempt bond debt exception to Exclusion 4(m).

### D. Exclusion 4(n) – Professional Services Exclusion

Exclusion 4(n) is contained in Endorsement #11, which is entitled "Not-For-Profit Health Care Organization Amendatory Endorsement." (ECF No. 1-3 at 6, 9). Under Exclusion 4(n), "[t]he insurer shall not be liable to make any payment for Loss in connection with a Claim made against an insured," (ECF No. 1-1 at 14), "alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others . . . ." (ECF No. 1-3 at 9). Exclusion 4(n) goes on to explain that it does not apply to certain claims, such as Employment Practices Claims. *Id.*

Lifespan argues that Exclusion 4(n) must be read in the context of Endorsement #11 and in the context of a D&O Policy, and when read this way, it excludes from coverage only professional services involved in the actual provision of healthcare to others. (ECF No. 22-1 at 58-67). Lifespan points out that all of Endorsement #11 addresses healthcare issues, so Exclusion 4(n) logically addresses healthcare issues as well. *Id.* at 58. Focusing on Exclusion

4(n)'s language, Lifespan notes that the term "professional services" appears between the words "medical" and "treatments." (ECF No. 43 at 8-9.) More broadly, Lifespan emphasizes that the insurance policy at issue is a D&O Policy, not a professional liability or malpractice type of policy; Lifespan has separate malpractice insurance covering its performance or failure to perform healthcare services, so it makes sense that the D&O policy does not cover those claims. (ECF No. 22-1 at 64-65; ECF No. 34-1 at 4-5). Lifespan further contends that reading the D&O Policy the way defendants read it would eviscerate the coverage offered by the D&O Policy. (ECF No. 34-1 at 6; *see also Porto*, 811 A.2d at 1201 ("An insurer is free to structure the coverage as broadly or as narrowly as the policy provides, so long as the coverage (or lack thereof) is not illusory and does not violate public policy.")).

Defendant insurance companies contend that all of the claims at issue arise out of Lifespan's "professional services" — corporate management services to NEMC — so there is no coverage. (*See, e.g.*, ECF No. 20-1 at 7-10; ECF No. 24-1 at 23-26). They assert that the term "professional services" is modified by the term "other" and therefore this exclusion is not limited to healthcare or medical services but instead excludes from coverage professional services generally. (ECF No. 28-1 at 23). Put another way, defendants contend that Lifespan is attempting to read the word "or" out of the policy. (ECF No. 20-1 at 10). They rely on the First Circuit's teaching that when an insurance policy's exclusion "is phrased in the disjunctive, 'the word *or* must be given effect.'" *Id.* (quoting *Welch Foods, Inc. v. Nat'l Union Fire Ins. Co.*, 659 F.3d 191, 194 (1st Cir. 2011) (emphasis added)).

This Court must read the D&O Policy in its entirety and give its terms their usual meanings. *See, e.g.*, *Bliss Mine Road Condo. Ass'n*, 11 A.3d at 1084 (considering the meaning of an undefined policy term "in the context of the contract by looking at the entire policy and

48

giving its terms their plain, ordinary, and usual meaning"). In this case, that means reading Exclusion 4(n) within the confines of Endorsement #11 and the D&O Policy as a whole. *See Sullivan*, 633 A.2d at 686 (when interpreting terms in an insurance policy, courts cannot "view[] a word in insolation or [take] a phrase out of context"). Within the context of Endorsement #11 and the D&O Policy, this Court finds that Exclusion (n) pertains to Lifespan's performance or rendering of medical services or treatment for others, as well as Lifespan's performance of healthcare-related professional services or treatments for others. Within this context, the phrase "or other professional services" refers to professional healthcare services that might not otherwise fall under the term "medical." This could include the insurance companies' desire to exempt nursing services, hospital laboratory services, or other professional services in a healthcare setting. This Court reaches this conclusion by a plain reading of the exclusion ("medical or other professional services"); its location between two healthcare-related provisions ("medical" and "treatments"); and the entire content of the exclusion ("Not-For-Profit Health Care Organization Amendatory Endorsement").

Furthermore, under Rhode Island law, an insurance policy's exclusion from coverage "must be clear and unambiguous." *Scorpio*, 2012 WL 2020168, at *3 (quoting *Porto*, 811 A.2d at 1192). Rhode Island law dictates that when "the terms of an insurance contract are subject to more than one reasonable interpretation, the insurance contract will be strictly construed against the insurer." *Textron*, 638 A.2d at 539 (citing *Streicker*, 583 A.2d at 551-52). To the extent that the exclusion at issue could be read two ways, — restricting professional services to those related to healthcare versus any and all professional services — this Court must construe the exclusion against the insurers, finding that it only excludes healthcare-related professional services. *See id.* Defendant insurance companies therefore failed to meet their burden, *see Gen. Acc. Ins. Co.*, 716

A.2d at 757, to show that this exclusion pertains to any and all "professional services," those beyond the scope of medical or healthcare-related services. While it would have been possible to have an exclusion that pertains to all professional services in the generic sense, defendant insurance companies failed to write such an exclusion in clear and unambiguous terms. Since Exclusion 4(n) pertains only to healthcare-related and medical professional services, it does not bar coverage for claims related to Lifespan's corporate management services.

## V.    CONCLUSION

This Court finds that there is no genuine issue of material fact and that Lifespan is entitled to judgment as a matter of law as to Counts I, II, and III because through its D&O Policy, Lifespan has insurance coverage for the monetary losses it incurred due to the breaches of fiduciary duties and gross negligence in connection with the negotiation of NEMC's health insurer contracts and an interest rate swap transaction. Defendant insurance companies have failed to prove the applicability of any exclusions to coverage.

Accordingly, this Court DENIES National Union's Motion for Summary Judgment as to all of the claims asserted against it (Counts I, II, IV, VI, and VIII) (ECF No. 20); DENIES RLI's Motion for Summary Judgment as to Counts I and III (ECF No. 24); and GRANTS Lifespan's Motion for Summary Judgment as to Counts I, II, and III of its complaint (ECF No. 22).

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

November 17, 2014